UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
                                     :

CHLOE COSCARELLI, et al.                  :

                                 :

                  Plaintiffs,        :

                                 :               18-CV-5943 (JMF)

        -v-                          :

                                 :            OPINION AND ORDER

ESQUARED HOSPITALITY LLC, et al.,    :

                                 :

                 Defendants.     :

                                 :
----------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

        This action emerges from the soured relationship between celebrity vegan chef Chloe

Coscarelli and her former partner. Coscarelli and three LLCs of which she is sole owner or

member — Chef Chloe LLC, CC Hospitality Holdings LLC, and CKC Sales, LLC — bring

twenty-one claims against ESquared Hospitality LLC and BC Hospitality Group LLC (formerly

known as CCSW LLC). *See* Docket No. 1 ("Compl.").[1] The Complaint alleges everything from

breach of contract and unjust enrichment to federal trademark and cyber piracy violations. *Id.*

Now pending are a slew of motions and cross-motions. First, Coscarelli and Chef Chloe LLC

seek a preliminary injunction preventing Defendants from launching or participating in retail

food sales under the "by Chloe" name and a declaration that Chef Chloe LLC holds a fifty-

percent membership interest in BC Hospitality Group. Docket No. 22 ("Pls.' PI Mem."). For

their part, Defendants move to dismiss all twenty-one claims on the ground that they are subject

---

[1] For clarity, the Court refers throughout this Opinion to Chloe Coscarelli as "Coscarelli";
to the three LLC Plaintiffs by their respective names; to Defendant ESquared Hospitality LLC as
"ESquared"; and to Defendant BC Hospitality Group as "CCSW," except where context calls for
doing otherwise.

to a mandatory arbitration agreement or, in the alternative, five claims pleaded under California law on the ground that New York law applies. Docket No. 28. Finally, Plaintiffs move to strike various declarations filed with Defendants' motion papers. Docket Nos. 39, 46, 48.

For the reasons that follow, the Court (1) denies Defendants' motion to dismiss to the extent it seek to compel arbitration of all Plaintiffs' claims in advance of the Court's ruling on Plaintiffs' motion for a preliminary injunction, but (2) grants it the extent that it seeks dismissal of Coscarelli's California-law claims (albeit with leave to replead those claims); (3) denies Plaintiffs' motion for preliminary injunctive relief and motions to strike; and (4) stays further proceedings as to Counts 2, 5, and 6 of the Complaint pending arbitration, while reserving judgment on whether the remaining claims should also be stayed.

## BACKGROUND[2]

Coscarelli is a well-known vegan chef and culinary author and the sole owner of Chef Chloe LLC. *See* Compl. ¶¶ 24-28. In 2014, Chef Chloe LLC and ESquared entered into a partnership with the goal of opening a "fast casual" vegan restaurant and collaborating on other food-related "Approved Projects." *See id.* ¶¶ 7, 39-40, 82. Through an Operating Agreement, the two entities formed CCSW LLC (since renamed BC Hospitality Group). *See id.* ¶ 7; *see also* Docket No. 1-3 ("Operating Agreement" or "OA"), at 1. Coscarelli signed the Operating Agreement three times — once on behalf of Chef Chloe LLC; a second time as a "Manager" of the newly-formed entity, CCSW; and finally underneath a line of text reading "Acknowledged

---

[2]    These facts are drawn primarily from Plaintiffs' Complaint and the materials referenced or relied upon therein. In discussing whether Coscarelli agreed to arbitrate her claims and whether Plaintiffs are entitled to preliminary injunctive relief, however, the Court also relies on other admissible evidence in the record. *See, e.g.*, *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (motion to compel arbitration); *Park Irmat Drug Corp. v. Optumrx, Inc.*, 152 F. Supp. 3d 127, 132 (S.D.N.Y. 2016) (motion for preliminary injunction).

and Agreed as to the Rights and Obligations Set Forth Herein." OA 53. The same day, CCSW entered into a "Name, Face and Likeness Agreement" with Coscarelli in her individual capacity; as its name suggests, that Agreement governs the use of Coscarelli's name and publicity rights. *See* Docket No. 1-2 ("NFL Agreement").

The Operating Agreement establishes the basic operating rules for CCSW and spells out the rights and duties of the two members, originally ESquared and Chef Chloe LLC. Five provisions of the Operating Agreement are particularly relevant here. First, Section 4.1 of the Agreement identifies the "Business" of CCSW as being (1) the management of fast-casual vegan restaurants and (2) so-called "Approved Projects." OA § 4.1. An "Approved Project" is defined, in turn, as "any project related to the food and beverage industry that utilizes one or more of the NFL Rights *or the By Chloe Mark*, and which has been *pre-approved in writing by* [*Chef Chloe LLC*]." *Id.* (emphasis added). Second, the Agreement defines the "By Chloe Mark" to mean the "By Chloe Word Mark," which is the "standard character mark 'BY CHLOE' in connection with the goods and services of the Business," and the "By Chloe Design Mark," which is "any logo . . . incorporating the By Chloe Word Mark in stylized font . . . and used in connection with the goods and services of the Business." *Id.* § 1.1, at 3-4. Third, under the Agreement, "[t]he parties acknowledge and agree that the By Chloe Mark incorporates [Coscarelli's] first name, and that nothing contained in this Agreement is intended to bestow upon [CCSW] any rights to [Coscarelli's] NFL Rights (as defined in the NFL License Agreement)." *Id.* § 4.4. CCSW, however, "own[s] all right, title and interest in and to the By Chloe Mark." *Id.* § 4.4(a).

Fourth, the Operating Agreement named Chef Chloe LLC as the "Service Member" and laid out certain duties to be performed by Chef Chloe LLC through Coscarelli, including developing the fast-casual vegan restaurant "concept" and helping to run the restaurant. *Id.*

§§ 19.1, 19.2. The Agreement provided, however, that Chef Chloe LLC could be terminated as the Service Member "for Cause or upon the occurrence of a Termination Event." *Id.* § 19.3(a). Should Chef Chloe LLC be so terminated, CCSW retained the right to use Coscarelli's pre-existing intellectual property and her name, face, and likeness rights "in the operation of the Restaurants (including New Restaurants) and Approved Projects (including new Approved Projects approved as set forth in the NFL License Agreement)." *Id.* § 19.3(c). Finally, the Operating Agreement also included an arbitration provision stating in relevant part as follows: "All claims, disputes, deadlocks and other matters in question between the parties arising out of, or relating to, this Agreement or the breach hereof . . . shall be decided by arbitration in accordance with this Section 20.19 unless otherwise mutually agreed to by the parties." OA § 20.19(a). The provision, however, contains an explicit carve-out for disputes involving claims for "immediate injunctive relief": "Notwithstanding the foregoing [arbitration clause], in the event the Dispute involves a claim for which immediate injunctive relief is being sought, a party shall have the right to bring an action for such relief in a court of competent jurisdiction prior to commencing an arbitration action." *Id.* § 20.19(e).

      As noted, the NFL Agreement — executed on the same day as the Operating Agreement — governs the use of Coscarelli's name and publicity rights. Specifically, the Agreement bestowed upon CCSW the right to use Coscarelli's "full and formal name, nickname or variations of her name" and "versions of her image, signature, voice, likeness and other elements or attributes of her persona, identity, or personality." NFL Agreement 1. Those rights were not unlimited, however. Under the terms of the Agreement, CCSW is entitled to use them "solely in connection with the operation, marketing and promotion of the Restaurants, and . . . solely in connection with the manufacturing, distribution, advertising and promotion . . . of products and

services bearing the company IP and associated with the Approved Projects." *Id.* § 1(a). Moreover, Coscarelli "retain[ed] the right to use the NFL Rights in any whatsoever *except in connection with the By Chloe Mark*, including but not limited to . . . packaged foods and beverages." *Id.* § 1(b) (emphasis added). The NFL Agreement emphasized that "[a]ll rights in and to the By Chloe Mark are reserved by [CCSW] as stated in the Operating Agreement." *Id.* In contrast to the Operating Agreement, the NFL Agreement does not contain an arbitration clause. *See id.* at 1-6.

In July 2015, the restaurant — "by Chloe" — opened to positive reviews. *See* Compl. ¶¶ 39-40. But the relationship between the two partners soon soured. In 2016, Chef Chloe LLC sought injunctive relief in New York state court to prevent ESquared from abusing the "Deadlock Rule" contained in the Operating Agreement. *See id.* ¶ 111. In turn, ESquared commenced arbitration proceedings against Chef Chloe LLC, seeking a declaration that various financing deals Esquared had arranged were valid and alleging that Coscarelli and Chef Chloe LLC had breached the Operating Agreement and fiduciary duties owed to CCSW. *See id.* ¶¶ 9, 42; *see also* Docket No. 22-15 ("Arbitration Award"), at 26. In a final award entered on March 21, 2017, the arbitrator approved the financing agreements in dispute, ruled that Coscarelli and Chef Chloe LLC had breached their duties under the Operating Agreement and common law, and held that Chef Chloe LLC was "terminated" as a member of CCSW "for Cause." Arbitration Award 33-40, 43-49. The following day, ESquared — on behalf of CCSW — sent a letter to Coscarelli purporting to exercise its right under the Operating Agreement to repurchase Chef Chloe LLC's membership interest in CCSW for an amount equal to the value of that membership interest, which ESquared asserted was zero dollars. *See* Compl. ¶ 102. The Supreme Court, New York County confirmed the arbitrator's award in all relevant parts, and the

First Department affirmed that judgment earlier this week. *See Chef Chloe, LLC v. Wasser*, Index 653041/16, 2019 WL 346586 (N.Y. App. Div. 1st Dep't Jan. 29, 2019).

Since the initial arbitral award, Defendants have continued to operate a number of "by Chloe" restaurants in the United States and the United Kingdom. *See* Compl. ¶¶ 44, 48. They have also sold various packaged foods under the "by Chloe" name, including cookie dough, chewing gum, push pops, and cupcakes. *See id.* ¶¶ 58-60. In April 2018, Bain Capital issued a press release announcing that "by CHLOE, the popular plant based, fast-casual restaurant startup," had secured an investment "to support the brand's growth and expansion." *Id.* ¶¶ 125-26. Less than a week later, three of the Plaintiffs here — all except Chef Chloe LLC — filed a fourteen-count complaint against Esquared and BC Hospitality Group in the United States District Court for the Central District of California. *See* Complaint, *Coscarelli v. ESquared Hosp. Grp. LLC*, No. 18-CV-02945 (GW) (C.D. Cal. Apr. 9, 2018), ECF No. 1. On June 29, 2018, after Esquared filed a motion to dismiss, Coscarelli voluntarily dismissed that case. *Id.* ECF No. 37. The same day, she and the other Plaintiffs filed this action. *See* Compl.; Docket No. 29 ("Defs.' Mem."), at 2.

## DISCUSSION

The Court begins with Defendants' motion to dismiss on the ground that Plaintiffs' claims are subject to arbitration, which — based on the substance of Defendants' arguments, *see* Defs.' Mem. 18-19; Docket No. 64 ("Defs.' Reply"), at 1-5, 8-10 — the Court treats as a motion to compel arbitration. *See, e.g.*, *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 & n.3 (2d Cir. 2016) (noting that a district court may treat a motion to dismiss as a motion to compel arbitration where the moving party manifests "an intent . . . to compel arbitration"); *accord Begonja v. Vornado Realty Tr.*, 159 F. Supp. 3d 402, 405 n.1 (S.D.N.Y. 2016) (collecting cases). The Court

then turns to Defendants' motion to dismiss for failure to state a claim, to Plaintiffs' motion for a preliminary injunction, and to Plaintiffs' motions to strike.

## A. The Motion to Compel Arbitration

Defendants contend that all four Plaintiffs, and all twenty-one of their claims, fall within the scope of the Operating Agreement's arbitration clause. Defs.' Mem. 23.[3] Plaintiffs concede that the arbitration clause ultimately requires arbitration of Chef Chloe LLC's claims, but they contend that it does not bind the three other Plaintiffs and does not apply yet because Chef Chloe LLC seeks preliminary injunctive relief. Docket No. 42 ("Pls.' Opp'n"), at 9-10. For the reasons that follow, the Court concludes that Chef Chloe LLC need not arbitrate its claims with Defendants until after its motion for injunctive relief is resolved and that none of the three other Plaintiffs are required to arbitrate at all.

### 1. Applicable Legal Principles

The FAA reflects "a strong federal policy favoring arbitration as an alternative means of dispute resolution." *Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp.*, 246 F.3d 219, 226 (2d Cir. 2001). In light of that policy, it is well established that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). At the same time, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs., Inc. v. Comm'cns Workers of Am.*, 475 U.S. 643, 648 (1986) (internal quotation marks omitted). That is, arbitration under the FAA "is a matter of consent," not coercion, *Granite Rock Co. v. Int'l Bhd. of Teamsters,* 561 U.S. 287, 299 (2010)

---

[3] Neither Defendants nor Plaintiffs argue that the threshold determinations of the arbitration clause's scope and meaning must themselves be decided by an arbitrator, *cf., e.g.*, *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005), so the Court addresses them.

(internal quotation marks omitted), and courts must ultimately "give effect to the contractual rights and expectations of the parties," *Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (internal quotation marks omitted).

Under the FAA, "the role of courts is limited to determining two issues: i) whether a valid agreement or obligation to arbitrate exists, and ii) whether one party to the agreement has failed, neglected or refused to arbitrate." *Jacobs v. USA Track & Field*, 374 F.3d 85, 88 (2d Cir. 2004) (internal quotation marks omitted). Embedded within the first inquiry — whether the parties agreed to arbitrate — is the issue of "whether an entity is a party to [an] arbitration agreement" in the first instance. *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 95 (2d Cir. 1999). In resolving these questions, the Court must "apply ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62-63 (1995) (applying "cardinal principle[s] of [state-law] contract construction" to construe a punitive-damages clause in an arbitration agreement).

In deciding Defendants' motion to compel arbitration, the Court applies "a standard similar to that applicable for a motion for summary judgment." *Meyer*, 868 F.3d at 74 (internal quotation marks omitted). Under that standard, "[i]f there is a genuinely disputed factual issue whose resolution is essential to the determination of the applicability of an arbitration provision, a trial as to that issue will be necessary." *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011); *see also* 9 U.S.C. § 4; *Tehran-Berkeley Civil & Envtl. Engineers v. Tippetts-Abbett-McCarthy-Stratton*, 816 F.2d 864, 868-69 (2d Cir. 1987) (remanding for a hearing on whether a partnership, "as an entity," or its respective partners, individually, were parties to a contract containing an arbitration clause). But

"where the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law," no trial is necessary. *Wachovia Bank*, 661 F.3d at 172; *accord Vacold LLC v. Cerami*, 545 F.3d 114, 123 (2d Cir. 2008) (noting that, under New York law, summary judgment is appropriate "[w]here the evidentiary foundation consists entirely of writings" and a party's intent to be bound is determinable from those writings).

## 2. Discussion

Here, there is no dispute that Chef Chloe LLC and Esquared agreed to arbitration. *See* OA § 20.19(a). Instead, the parties' dispute turns on whether that agreement binds the other Plaintiffs — Coscarelli herself, CC Hospitality Holdings LLC, and CKC Sales, LLC — and whether it applies to all of Plaintiffs' claims, notwithstanding Plaintiffs' request for preliminary injunctive relief. *Compare* Defs.' Mem. 19-22, *and* Defs.' Reply 2-5, *with* Pls.' Opp'n 9-16. The Court addresses each entity in turn.

### a. Chef Chloe LLC

The Court begins with Chef Chloe LLC's claims. Plaintiffs concede that Chef Chloe LLC is a party to the Operating Agreement and that its claims (Counts 2, 5, and 6), which concern that Agreement, are eventually subject to arbitration. *See* Pls.' Opp'n 9-10. Relying on Section 20.19(e) of the Operating Agreement, however, they contend that Chef Chloe LLC is entitled to seek preliminary injunctive relief in this Court "prior to commencing an arbitration action." OA § 20.19(e). Defendants counter that Chef Chloe LLC cannot avail itself of Section 20.19(e) because (1) the LLC did not seek such relief "immediate[ly]" and (2) in this case, New York state courts are the "court[s] of competent jurisdiction." Defs.' Reply 2.

Defendants' arguments do not withstand scrutiny. To begin, Section 20.19(e) does not limit a party's judicial recourse to claims for relief brought *immediately*, but rather to "claim[s]

for which immediate injunctive relief *is being sought*." OA § 20.19(e) (emphasis added). Here, Chef Chloe LLC indisputably seeks "immediate injunctive relief" for the claims arising out of the Operating Agreement. By its terms, therefore, Section 20.19(e) entitles Chef Chloe LLC to bring its claims arising under the Operating Agreement in court "prior to commencing an arbitration action." OA § 20.19(e).[4] As for the "competen[ce]" of this Court's "jurisdiction," Defendants do not explain why New York state court is a "court of competent jurisdiction" under Section 20.19(e), but this Court is not. "A court of competent jurisdiction is a court with the power to adjudicate the case before it." *Lightfoot v. Cendant Mortg. Corp.*, 137 S. Ct. 553, 560 (2017) (citing Black's Law Dictionary 431 (10th ed. 2014)). This Court has jurisdiction to adjudicate Plaintiffs' claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1367. *See* Compl. ¶¶ 20-21. The fact that Coscarelli sought review of the arbitrator's judgment and award in New York Supreme Court last year, *see* Defs.' Reply 2, does not change that.

In short, the Operating Agreement does not yet subject Chef Chloe LLC's claims to arbitration. Instead, it provides that this Court should first decide Chef Chloe LLC's claims for preliminary injunctive relief. Accordingly, Defendants' motion to dismiss those claims (Counts 2, 5, and 6) outright is denied.

### b. CC Hospitality Holdings and CKC Sales

Defendants' contention that the claims of CC Hospitality Holdings LLC and CKC Sales LLC (Counts 3, 15, 16, 17, 19, and 20) are also subject to arbitration is easily rejected, as neither entity is a signatory to the Operating Agreement. As support for their contention, Defendants point to Section 20.14 of the Operating Agreement, which provides in relevant part that,

---

[4]     As discussed below, the contention that Chef Chloe LLC did not bring its claims immediately, although not relevant to the question of arbitrability, is relevant to the merits of Chef Chloe's application for preliminary injunctive relief.

"[e]xcept as otherwise provided herein, this Agreement is binding upon, and inures to the benefit of, the Members and their transferees, successors and assigns." OA § 20.14; *see* Defs.' Reply 5. Defendants provide no evidence, however, that CC Hospitality Holdings LLC or CKC Sales LLC is a transferee, successor, or assign of Chef Chloe LLC's rights or obligations under the Operating Agreement. At most, they show that CKC Sales LLC *might* be the assignee of the copyright in one of Coscarelli's cookbooks, *see* Defs.' Reply 5, but that is irrelevant to whether the *Operating Agreement* binds either CC Hospitality Holdings LLC or CKC Sales LLC. Nor do Defendants demonstrate that CC Hospitality Holdings LLC or CKC Sales LLC may be bound under other valid theories of contractual liability for non-signatories. *See Thomson-CSF, S.A. v. Am. Arbitration Ass'n,* 64 F.3d 773, 776 (2d Cir. 1995) (recognizing "five theories for binding nonsignatories to arbitration agreements: 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel").[5] Accordingly, the Court denies in its entirety Defendant's motion to dismiss Counts 3, 15, 16, 17, 19, and 20. *See, e.g.*, *Boroditskiy v. European Specialties LLC*, 314 F. Supp. 3d 487, 496 (S.D.N.Y. 2018) (concluding as a matter of law that non-signatories to an agreement were not bound by its arbitration clause).

### c. Chloe Coscarelli

The final question is whether Coscarelli must arbitrate the claims she brings in her individual capacity. Defendants argue that Coscarelli is individually bound because she signed the Operating Agreement in her individual capacity. Defs.' Reply 4. There is no dispute that two of Coscarelli's three signatures on the Operating Agreement were in a representative capacity — one on behalf of Chef Chloe LLC, a party to the Operating Agreement; and the other

---

[5]     In a footnote, Defendants tersely allude to "[p]iercing the corporate veil," *see* Defs.' Reply 5 n.6, but that is insufficient to raise the argument, *see, e.g.*, *FTC v. Tax Club, Inc.*, 994 F. Supp. 2d 461, 471 n.1 (S.D.N.Y. 2014).

as Manager of CCSW, the entity brought into existence by the Agreement. *See* Pls.' Opp'n 12; Defs.' Reply 4; *see also* OA 53. Defendants argue, however, that Coscarelli's third signature on the Operating Agreement — above which is written, "Acknowledged and Agreed as to the Rights and Obligations Set Forth Herein" — binds her personally. Defendants' argument appears to be that those words, in conjunction with the *absence* of an entity name over the third signature indicating that Coscarelli was signing in a representative capacity, shows that she was signing in a personal capacity. *See* Defs.' Reply 4. According to Defendants, "[t]he true question . . . is not whether Coscarelli is technically a 'party' to the Operating Agreement . . . [but] whether she is bound by . . . the arbitration clause contained therein." *Id.*

But whether Coscarelli is a party to the Operating Agreement is *precisely* the question. Even if Coscarelli were somehow "bound by" the Operating Agreement — which, as noted below, she is likely not — she would still not be obligated to arbitrate her claims against ESquared because the arbitration clause is limited by its terms to "[a]ll claims, disputes, deadlocks and other matters in question between *the parties*." OA § 20.19(a) (emphasis added). The other arbitration provisions (discussing, for example, the governing rules, notice procedure, and treatment of related claims) also use the terms "party" and "parties." *Id.* § 20.19(b)-(e). And although the term "parties" is not expressly defined in the Operating Agreement, *see id.* at 9, the Agreement does declare that it was "entered into by and among ESquared Hospitality . . . and Chef Chloe, LLC." OA 1. In common usage, the "parties" to an agreement are those who "enter[] into" the agreement. *See* Black's Law Dictionary 1297 (10th ed. 2014) (defining "party" as "[s]omeone who takes part in a transaction"); *cf. EEOC v. Waffle House, Inc.*, 534 U.S. 279,

294 (2002) ("No one asserts that the EEOC is a party to the contract, or that it agreed to arbitrate its claims. It goes without saying that a contract cannot bind a nonparty.").[6]

That conclusion is reinforced by comparison with the NFL Agreement, which was executed on the same day as the Operating Agreement. By contrast to the Operating Agreement, the NFL Agreement was "made and entered into . . . by and among *Chloe Coscarelli* . . . and CCSW LLC." NFL Agreement 1 (emphasis added). Moreover, on the NFL Agreement, above Coscarelli's name and signature, it says in boldface type "CHLOE COSCARELLI," indicating that she — rather than one of her LLCs — was a party to the contract. NFL Agreement 7-8. Those provisions make plain that the drafters of the two agreements knew how to distinguish between an LLC owned by Coscarelli and Coscarelli herself and knew how to make plain if Coscarelli herself was party to an agreement. That is, reading the two agreements together, the Court is compelled to conclude that Coscarelli is not a "party" to the Operating Agreement and, thus, outside the scope of its arbitration clause. *See, e.g.*, *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 143 (2d Cir. 1998) ("Under New York law, all writings forming part of a single transaction are to be read together."); *Genger v. Genger*, 76 F. Supp. 3d 488, 496-97 (S.D.N.Y. 2015) ("Contracts that are executed at different times should be interpreted together if the parties assented to all the promises as a whole so that there would have been no bargain whatever if any promise or set of promises had been stricken." (internal quotation marks omitted)).[7]

---

[6]     Notably, although the arbitrator was not presented with the precise issue before the Court, she also concluded that Coscarelli "is not a party to the [Operating Agreement] (although a signatory)." Arbitration Award 33.

[7]     For present purposes, the Court need not resolve the parties' disagreement about whether Coscarelli's claims arise out of the Operating Agreement or the NFL Agreement, as the NFL Agreement does not contain any arbitration clause. *See* Defs.' Mem. 3-5, 11-23; Pls.' Opp'n 13.

In short, based on the unambiguous meaning of the Operating Agreement's arbitration clause, the Court concludes that Coscarelli is not required to arbitrate her claims against Defendants. *See, e.g.*, *Medidata Sols., Inc. v. Veeva Sys. Inc.*, No. 17-CV-589 (LGS), 2017 WL 3503375, at *2 (S.D.N.Y. Aug. 16, 2017) ("Plaintiffs and Defendant have no contractual or other relationship that would lead to the conclusion that Plaintiffs should be compelled to arbitrate their dispute with Defendant.").[8] Accordingly, the Court denies Defendants' motion to dismiss Coscarelli's claims (Counts 1, 4, 7-14, 18, and 21) on that basis.[9]

## B. The Motion to Dismiss for Failure to State a Claim

Defendants move, in the alternative, to dismiss five of Coscarelli's claims — Counts 7, 8, 10, 11, and 18 — for failure to state a claim. The five claims are for violation of Coscarelli's right of publicity under California Civil Code § 3344 and California common law (Counts 7 and 8); unfair business practices and false advertising under California Business and Professions Code §§ 17200 and 17500 (Counts 10 and 11); and violation of California's cyber privacy laws, *see* California Civil Code § 17525 (Count 18). Defendants argue that these claims must be dismissed because both the Operating Agreement and the NFL Agreement contain New York choice-of-law provisions, and Coscarelli therefore "ha[s] no claims under California common or statutory law." Defs.' Mem. 23-25; *see* Defs.' Reply 5-8.[10] Coscarelli contends that the

---

[8]    Because the relevant language of the Operating Agreement is unambiguous, the Court need not examine Defendants' barely developed extrinsic evidence that Coscarelli intended to be personally bound by the Agreement. *See, e.g.*, *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009). In any event, neither Coscarelli's testimony during the arbitration nor the mere fact that she submitted to the arbitration are persuasive evidence that she is bound by the Operating Agreement in an individual capacity. *See* Docket No. 63-1, at 1830.

[9]    In light of that conclusion, the Court need not and does not reach Coscarelli's alternative argument that trademark cancellation claims are not arbitrable. *See* Pls.' Opp'n 16.

[10]    In their reply memorandum, Defendants also assert that New York applies because Coscarelli is a domiciliary of New York. Defs.' Reply 6-7. The Court disregards that argument,

agreements' choice-of-law provisions are limited to contractual claims and that her claims under California law — which do not sound in contract — are therefore sound. Pls.' Opp'n 17-21.

The scope of a contractual choice-of-law provision is determined by the law of the forum, not the law invoked by the provision. *See Fin. One Pub. Co. v. Lehman Bros. Special Fin. Inc.*, 414 F.3d 325, 333 (2d Cir. 2005). Under New York law, "tort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract, even when the contract also includes a broader forum-selection clause." *Id.* at 335. Thus, for example, a provision stating that "*[t]his Agreement* will be governed by . . . the laws of the State of New York (without reference to choice of law doctrine)" does not extend to noncontract claims. *Id.* at 335 (emphasis added). By contrast, if "the express language" of a choice-of-law provision is "'sufficiently broad' as to encompass the entire relationship between the contracting parties," courts have held that the clause does apply "to claims for tort arising incident to the contract." *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996); *see Bausch & Lomb Inc. v. Mimetogen Pharm., Inc.*, No. 14-CV-6640 (FPG), 2016 WL 2622013, at *8 (W.D.N.Y. May 5, 2016) (concluding that a choice-of-law provision encompassing the parties' "[a]greement and all claims related to it" applied to the plaintiff's tortious interference claims); *see also Holmes v. Apple Inc.*, No. 17-CV-4557 (ER), 2018 WL 3542856, at *12 n.12 (S.D.N.Y. July 23, 2018) (similar).

Applying those principles here, the Court concludes that the Operating Agreement's choice-of-law provision does not encompass Coscarelli's claims (whether or not she is bound by

---

however, because it is irrelevant to the applicability of the choice-of-law provision; it was raised for the first time in Defendants' reply and is thus waived for now, *see In re Motors Liquidation Co.*, 538 B.R. 656, 665 (S.D.N.Y. 2015); and it appears to rest on materials that the Court may not appropriately consider on a motion to dismiss.

the Agreement in the first place). Indeed, the provision — "This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to New York choice of law provisions)," OA § 20.18 — is substantially identical to the provision in *Finance One Public* that the Second Circuit held did not sweep in tort claims. *See Fin. One. Pub. Co.*, 414 F.3d at 332; *accord Mayaguez S.A. v. Citigroup, Inc.*, No. 16-CV-6788 (PGG), 2018 WL 1587597, at *10 (S.D.N.Y. Mar. 28, 2018). The NFL Agreement, however, presents a different story.[11] Its choice-of-law provision reads as follows: "This Agreement *and the legal relations between the parties hereto* will be governed by and construed in accordance with the internal laws of the State of New York and without regard to conflicts of laws principles." NFL Agreement 6 (emphasis added). In referring to "the legal relations between the parties," the clause is "'sufficiently broad' as to encompass the entire relationship between the contracting parties." *Krock*, 97 F.3d at 645. In fact, it is broader than provisions that have been found to encompass claims arising outside of, or incident to, contract. *See, e.g.*, *Bausch & Lomb Inc.*, 2016 WL 2622013, at *6, *8 ("This Agreement and all claims related to it, its execution or the performance of the parties under it, shall be construed and governed in all respects according to the laws of the State of New York."); *Holmes*, 2018 WL 3542856, at *12 n.12 ("[T]he parties agreed that the laws of the state of Washington would apply to 'any dispute of any sort that might arise between [Plaintiff] and Amazon.'"); *McPhee v. Gen. Elec. Int'l, Inc.*, 426 F. App'x 33, 34 (2d Cir. 2011) ("[I]n the event of any dispute between the parties to this agreement or with

---

[11]     There is some tension between Defendants' arbitration arguments, which are premised on the assertion that all of Coscarelli's claims arise from the Operating Agreement, and its choice-of-law arguments, which rely more heavily on the NFL Agreement. *See* Defs.' Mem. 5, 14-17; Defs.' Reply 3 & n.4, 7-8. That said, there is no dispute that Coscarelli is a party to the NFL Agreement, and — as discussed above — that agreement's choice-of-law provision is broad enough to encompass any and all claims between her and CCSW.

respect to any claim arising from the employment relationship, the applicable law shall be the substantive and procedural law of New York." (internal quotation marks omitted)).

Accordingly, the Court concludes that the NFL Agreement requires that all of Coscarelli's claims be "governed by and construed in accordance with the internal laws of the State of New York and without regard to conflicts of laws principles." NFL Agreement 6.[12] It follows that her claims under California law (Counts 7, 8, 10-14, and 18) must be dismissed.[13] *See, e.g., Odyssey Reinsurance Co. v. Cal-Regent Ins. Servs. Corp.*, No. 3:14-CV-00458 (VAB), 2015 WL 4978460, at *2 (D. Conn. Aug. 20, 2015) (dismissing Connecticut counterclaims after determining that Texas law applied); *Cont'l Airlines, Inc. v. Mundo Travel Corp.*, 412 F. Supp. 2d 1059, 1070 (E.D. Cal. 2006) ("A valid choice-of-law provision selecting another state's law is grounds to dismiss a claim under California's UCL."). That said, the Court grants Coscarelli's request for leave to replead these claims under New York law. *See* Pls.' Opp'n 21; *see also, e.g.*, *Cont'l Airlines, Inc.*, 412 F. Supp. 2d at 1070 (granting leave to replead claims under the pertinent state's law); *Terex S. Dakota, Inc. v. Carraro Drive Tech, S.P.A.*, No. 3:17-CV-00154 (MPS), 2018 WL 1211198, at *7 (D. Conn. Mar. 8, 2018) (same).

---

[12] There is some merit to Plaintiffs' argument that construing the NFL Agreement's choice-of-law provision to apply to any and all claims between Coscarelli and CCSW could yield absurd results, "such as a personal injury claim asserted by Chloe in a California court over her being hit by a 'by Chloe' deliver truck in California would be subject to New York law." Pls.' Opp'n 20 n.14 (emphases omitted). But such concerns are not implicated here, as the five claims at issue here are incident to the NFL Agreement and the parties' rights and duties thereunder.

[13] Defendants seek dismissal on this basis only of Counts 7, 8, 10, 11, and 18. *See* Defs.' Mem. 23. Plaintiffs' own declaration, however, explains that Counts 12, 13, and 14 are pleaded under California law as well. Docket No. 44-1. Accordingly, Counts 12-14 are also dismissed.

## C. The Motion for a Preliminary Injunction

With that, the Court turns to the motion of Chef Chloe LLC and Coscarelli for a preliminary injunction (1) restraining Defendants from participating in retail packaged food sales under the "by Chloe" name and (2) declaring that Chef Chloe LLC is a fifty-percent member of BC Hospitality Group, the successor entity to CCSW. *See* Pls' PI Mem.; Docket No. 22-1.

### 1. Legal Standards

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); se*e also Hanson Tr. PLC v. ML SCM Acquisition Inc.*, 774 F.2d 47, 60 (2d Cir. 1985) (describing a preliminary injunction as "one of the most drastic tools in the arsenal of judicial remedies"). To obtain relief, the party seeking a preliminary injunction "must ordinarily establish (1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (internal quotation marks omitted). "A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks omitted). Thus, if a party fails to show irreparable harm, a court need not even address the remaining elements. *See, e.g.*, *Roberts v. Atl. Recording Corp.*, 892 F. Supp. 83, 88 (S.D.N.Y. 1995). By the same token, if the moving party fails to demonstrate a likelihood of success on the merits or sufficiently serious questions and a balance of hardships tipping "decidedly" in its favor, the Court may deny relief without

addressing the question of harm.  *See, e.g.*, *Daily Harvest, Inc. v. Imperial Frozen Foods Op Co. LLC*, No. 18-CV-5838 (ALC), 2018 WL 3642633, at *7 (S.D.N.Y. Aug. 1, 2018).

Significantly, it is well established that a court "must consider a plaintiff's delay in seeking relief when analyzing whether the plaintiff will suffer irreparable harm in the absence of relief."  *Ingber v. N.Y.C. Dep't of Educ.*, No. 14-CV-3942 (JMF), 2014 WL 2575780, at *2 (S.D.N.Y. June 9, 2014) (internal quotation marks omitted).  As the Second Circuit has explained, "[p]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights.  Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action."  *Citibank N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985).  A party's "failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury."  *Id.* at 277 (internal quotation marks omitted).  Thus, delay, "standing alone," may "preclude the granting of preliminary injunctive relief" because it "suggests that there is, in fact, no irreparable injury."  *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (internal quotation marks omitted); *see New York v. U.S. Dep't of Commerce*, 339 F. Supp. 3d 144, 148-49 (S.D.N.Y. 2018).

There is no bright-line rule for how much delay is too much, but courts in this Circuit "typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months."  *Gidatex, S.r.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998); *see Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005) ("We have found delays of as little as ten weeks sufficient to defeat the presumption of irreparable harm that is essential to the issuance of a preliminary injunction."); *see also, e.g.*, *Citibank*, 756 F.2d at 276 (denying a motion for preliminary injunctive relief based on a delay of "more than

ten weeks after [the plaintiff] learned" of the alleged infringer's plans "directly"); *New York*, 339 F. Supp. at 149 ("nearly two full months" (emphasis omitted)); *Monowise Ltd. Corp. v. Ozy Media, Inc.*, No. 17-CV-8028 (JMF), 2018 WL 2089342, at *2 (S.D.N.Y. May 3, 2018) ("five months of unjustified delay"); *Livery Round Table, Inc. v. N.Y.C. FHV & Limousine Comm'n*, No. 18-CV-2349 (JGK), 2018 WL 1890520, at *9 (S.D.N.Y. Apr. 18, 2018) (roughly three months' delay); *Life Techs. Corp. v. AB Sciex Pte. Ltd.*, No. 11-CIV-325 (RJH), 2011 WL 1419612, at *7 (S.D.N.Y. Apr. 11, 2011) (at least three months' delay); *Hessel v. Christie's Inc.*, 399 F. Supp. 2d 506, 520-21 (S.D.N.Y. 2005) (two months' delay).

### a. Chef Chloe LLC's Membership Stake in the Entity

Applying those standards here, the Court concludes that Chef Chloe LLC's delay in seeking to protect its putative fifty-percent membership interest in CCSW precludes a showing of irreparable harm. ESquared purported to exercise its right (on behalf of CCSW) to repurchase Chef Chloe LLC's fifty-percent membership interest in CCSW on March 22, 2017, one day after the final award was entered in the arbitration. *See* Compl. ¶ 102. After that, the record discloses no attempt by Chef Chloe LLC to dispute the repurchase of its membership share until the filing of the Complaint in this action on June 29, 2018 — at least one year after its last communications with opposing counsel. *See* Compl. ¶¶ 100-123.[14] Chef Chloe LLC responds that, although Coscarelli "has had claims stemming from [the repurchase] . . . since March 22, 2017, she did not have a basis to seek preliminary injunctive relief as of that date" because she did not learn of potential outside investments in CCSW until December 2017. Docket No. 50 ("Pls.' PI Reply"), at 2 (emphasis omitted). And after December 2017, Chef Chloe LLC

---

[14] Plaintiffs have moved to strike the very exhibits that would date those most recent communications more precisely, *see* Docket No. 46, but the Court does not rely on them in reaching this conclusion.

continues, the parties were engaged in settlement discussions that lasted through May 2018, so that period of time should not be counted against Chef Chloe LLC.  *See id.* at 1-3.

The latter point may have some merit, *see, e.g.*, *Marks Org. v. Joles*, 784 F. Supp. 2d 322, 333 (S.D.N.Y. 2011) (noting that the "diligent pursuit of settlement negotiations can justify delay"); *accord Monowise Ltd. Corp.*, 2018 WL 2089342, at *2, but the former is unpersuasive. Chef Chloe LLC fails to explain why it "did not have a basis to seek preliminary injunctive relief" to protect its membership interest until it learned in December 2017 that an outside investment group planned to purchase a stake in CCSW.  *See* Pls.' PI Mem. 20-22.  Chef Chloe LLC's motion is premised on its ongoing inability to veto "Major Decisions," as contemplated by the Operating Agreement, *see* OA § 7.4, and its worry that BC Hospitality Group will enter into "dilutive financing arrangements" that will further water down Chef Chloe's interest in the concern, Pls.' PI Mem. 15; *see id.* 20-22.  But the risk that ESquared would, without Chef Chloe LLC's say-so, make "Major Decisions" and enter into equity financing arrangements with outside investors was manifest as soon as the disputed repurchase occurred in May 2017.  In fact, Coscarelli's own declaration in support of the preliminary injunction alleges that ESquared (and its principal, Jimmy Haber) attempted to make "Major Decisions" and to enter "dilutive" financing arrangements without Coscarelli's approval even while Chef Chloe LLC was still a member of CCSW.  *See* Docket No. 22-2 ("Coscarelli PI Decl."), ¶¶ 17-22.  Thus, Chef Chloe LLC unjustifiably waited at least eight months (May to December 2017 and May to June 29, 2018) before seeking injunctive relief regarding Chef Chloe LLC's membership interest in CCSW.  That "unjustified delay . . . in itself warrants denial" of that portion of Plaintiffs' motion.  *Monowise Ltd. Corp.*, 2018 WL 2089342, at *2.

### b. Retail Packaged Food Sales

Coscarelli and Chef Chloe LLC also seek an injunction restraining Defendants from participating in retail packaged food sales under the name "by Chloe," alleging that Defendants' sales of packaged desserts constitute a breach of both the Operating Agreement and the NFL Agreement. *See* Pls.' PI Mem. 8-15. To establish a breach of contract under New York law, a plaintiff must establish "(1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011). Plaintiffs' claims here founder on the third element: proof of a breach.

The Court begins with the NFL Agreement. Coscarelli contends that Defendants have breached the NFL Agreement because it permits CCSW to use the rights to her "full and formal name, nickname or variations of her name" "*solely* in connection with" fast casual vegan restaurants or Approved Projects, of which she argues there are none. NFL Agreement 1 (emphasis added). The problem with that argument is that, by virtue of the Operating Agreement, CCSW owns the By Chloe Mark (or, more specifically, the "By Chloe Word Mark"), and thus its use, for whatever purpose, does not implicate Coscarelli's rights under the NFL Agreement. Under the Operating Agreement, "[t]he parties acknowledge and agree that the By Chloe Mark incorporates [Coscarelli's] first name, and . . . nothing contained in this Agreement is intended to bestow upon [CCSW] any rights to [Coscarelli's] NFL Rights." OA § 4.4. The Operating Agreement therefore draws a distinction between the By Chloe Mark — in which CCSW "own[s] all right, title and interest" — and Coscarelli's "NFL Rights." *Id.* The NFL Agreement recapitulates this division: "[Coscarelli] shall retain the rights to use the NFL Rights in any way whatsoever *except in connection with the By Chloe Mark*, including . . . packaged foods and services . . . . *All rights in and to the By Chloe Mark are reserved by*

[*CCSW*] *as stated in the Operating Agreement*."  NFL Agreement 1 (emphasis added).  In sum,

then, CCSW received limited rights to use Coscarelli's name, face, and likeness; Coscarelli

retained the rest; and separate from these NFL Rights was the By Chloe Mark, which CCSW

owns outright.  It follows that Defendants' allegedly infringing activity — the sale of desserts

under the "by Chloe" brand, which is identical to the By Chloe Word Mark, *see* OA § 1.1, at 3-4;

Docket No. 1-5 — does not exceed CCSW's rights under the NFL Agreement because it does

not concern Coscarelli's NFL Rights at all.

Whether Defendants have breached the Operating Agreement presents a closer question.

Plaintiffs argue that the Operating Agreement limits CCSW to running fast casual vegan

restaurants and other "Approved Projects."  OA § 4.1.  Engaging in sales of retail packaged

foods is plainly not the former, and — Plaintiffs claim — it cannot be the latter, as Chef Chloe

LLC never signed off on CCSW's participation in packaged food sales, as required by the

Operating Agreement.  *See* Pls.' PI Mem. 14; OA § 4.1; Coscarelli PI Decl. ¶ 14.[15]  For their

part, Defendants do not dispute that Coscarelli never approved the sale of retail packaged foods.

*See* Docket No. 38 ("Defs.' PI Opp'n"), at 10-12.  Instead, they argue that the "Approved

Projects" requirement "was *only* applicable when [Chef] Chloe LLC was a Member of CCSW."

*Id.* at 12.  Following termination of Chef Chloe LLC as Service Member and Defendants'

purported repurchase of its membership interest, they contend, they were entitled to use the By

Chloe Mark in the retail domain because "[n]either the Operating Agreement nor the NFL

---

[15]     Plaintiffs also argue CCSW has no right to use the By Chloe Word Mark on retail goods
because it is defined as the mark used "in connection with the goods and services of the
Business," and the "Business" is limited to fast casual vegan restaurants and Approved Projects.
Pls.' PI Mem. 14; OA 3-4 & § 4.1.  That is simply the same argument in slightly different garb.

Agreement provided any . . . Post-Repurchase restrictions upon CCSW's use of the Company IP, including the By Chloe Mark." *Id.* at 13.

The parties' dispute turns, therefore, on whether the requirement that "Approved Projects" be pre-approved by Chef Chloe LLC survives the termination of Chef Chloe LLC as Service Member or the repurchase of its membership interest by CCSW.[16]  Notably, the Operating Agreement is not blind to the possibility that Chef Chloe LLC would be terminated. In a section titled "Surviving Rights," the Agreement expressly provides that

> the Company's right to continue using . . . [Chef Chloe LLC's] Pre-Existing IP and the NFL Rights in the operation of the Restaurants (including New Restaurants) and Approved Projects (including new Approved Projects approved as set forth in the NFL License Agreement) shall survive any termination of [Chef Chloe LLC] as the Service Member and any Membership Interest Recapture . . . .

OA § 19.3(c).[17]  But, as the parties more or less acknowledge, the Operating Agreement is silent with respect to whether Chef Chloe LLC would still need to approve an "Approved Project" if it was no longer the Service Member or a member of the LLC at all.  *See* Defs.' PI Opp'n 12; Pls.' PI Reply 4.  Put differently, the Agreement does not explicitly address CCSW's ability to undertake a new "Approved Project" in the event that the designated "approver," Chef Chloe LLC, is no longer in a position to approve CCSW decisions because it has been terminated.

---

[16]     The parties vigorously debate whether Defendants' exercise of the repurchase right was valid.  *See* Pls.' PI Mem. 6-7, 16-18; Defs.' PI Opp'n 19-23.  For purposes of this motion, the Court need not resolve that debate.

[17]     The reference to "new Approved Projects . . . as set forth in the NFL Agreement" is puzzling, as the six-page NFL Agreement contains no provisions at all about "new 'Approved Projects.'"  The NFL Agreement *does* forbid CCSW from "us[ing] or grant[ing] others the right [to] use the NFL Rights for any new restaurants or projects (i.e., a restaurant or project that did not have an agreement signed at the time [of Chef Chloe LLC's termination as Service Member])."  NFL Agreement 4.  But that provision concerns CCSW's use of Coscarelli's NFL Rights, not Chef Chloe LLC's right to approve (or, as the case may be, veto) "Approved Projects" as defined in the Operating Agreement.

On the present record, the Court cannot resolve whether the approval requirement still applies if Chef Chloe LLC is terminated as the Service Member or its interest is repurchased. On the one hand, the "Approved Projects" provision requires Chef Chloe LLC's approval, and does not appear to allow for exceptions. On the other hand, the "Surviving Rights" language makes plain that the parties intended for CCSW to be able to engage in "new Approved Projects" even if Chef Chloe LLC no longer had a role in the company. And construing the provision to apply even if Chef Chloe LLC was terminated for cause would arguably be an absurd result. *Cf., e.g.*, *AAR Allen Servs. Inc. v. Feil 747 Zeckendorf Blvd LLC*, No. 13-CV-3241 (JMF), 2014 WL 1807098, at *4 (S.D.N.Y. May 6, 2014) ("[I]t is a well-established principle of New York contract law that a contract should not be interpreted to produce a result that is absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties." (alterations and internal quotation marks omitted)). The upshot is that the parties' agreement is ambiguous, *see Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 53 (2d Cir. 2012) ("[A]mbiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." (internal quotation marks omitted)), and neither side has submitted extrinsic evidence to resolve the ambiguity.

At this stage in the proceedings, the contract's ambiguity cuts against Plaintiffs, who bear the "affirmative burden to demonstrate likelihood of success on the merits or sufficiently serious questions going to the merits by a preponderance of the evidence." *Hostos v. 3225 Realty Corp.*, No. 17-CV-5989 (JPO), 2018 WL 3597516, at *3 (S.D.N.Y. July 25, 2018). That is, given the unresolved ambiguity, Plaintiffs have not shown a likelihood of success on the merits of their

claim that Defendants' use of the By Chloe Mark in retail packaged foods constitutes a breach of the Operating Agreement under New York law. *See Blue Planet Software, Inc. v. Games Int'l, LLC*, 334 F. Supp. 2d 425, 434-35 (S.D.N.Y. 2004). Nor have they shown that the balance of hardships tips "*decidedly*" in their favor, *New York ex rel. Schneiderman*, 787 F.3d at 650 (emphasis added), as their arguments on that score are premised on the assertion that Defendants have breached the two Agreements. Accordingly, the Court denies Plaintiffs' request for an injunction restraining Defendants from engaging in retail packaged food sales using the By Chloe Mark.

## D. The Motions to Strike

Finally, Plaintiffs move to strike two declarations filed by defense counsel, and one filed by James Haber, that accompanied Defendants' briefing on the pending motions, *see* Docket Nos. 39, 46, 48, and move in the alternative to compel defense counsel's deposition as a fact witness, *see* Docket Nos. 39, 46. Plaintiffs argue that the declarations are filled with improper legal argument, flout the Court's rules regarding page limits, recite facts outside the personal knowledge of the declarants, and mischaracterize the record. *See, e.g.*, Docket No. 40, at 1; Docket No. 47, at 1. There may be some merit to those arguments, but the Court did not rely on any of the disputed declarations in resolving these motions. Accordingly, the motions to strike them are denied as moot. *See Goodman v. Genworth Fin. Wealth Mgmt., Inc.*, 300 F.R.D. 90, 110 (E.D.N.Y. 2014); *Borghese Trademarks Inc. v. Borghese*, No. 10-CV-5552 (JPO), 2013 WL 143807, at *20 (S.D.N.Y. Jan. 14, 2013).

## CONCLUSION

To summarize, Defendants' motion to dismiss all twenty-one claims on the basis of the arbitration clause in the Operating Agreement is DENIED; Defendants' motion to dismiss counts

7, 8, 10, 11, 12, 13, 14, and 18 because of the New York choice-of-law provision in the NFL Agreement is GRANTED, but Plaintiffs are granted leave to replead those claims under New York law; and Plaintiffs' motion for a preliminary injunction and motions to strike are DENIED. Unless and until the Court orders otherwise, Plaintiffs shall file any amended complaint **within three weeks** of the date of this Opinion and Order.

With Plaintiffs' request for preliminary injunctive relief out of the way, Chef Chloe LLC concedes that arbitration of its claims under the Operating Agreement (Counts 2, 5, and 6) is now appropriate and that the Court should stay the litigation of those claims pending arbitration. *See* Pls.' Opp'n 10 ("[T]his Court should address Chef Chloe LLC's motion for preliminary injunctive relief and *then stay* counts 2, 5, and 6 pending arbitration."). That request is granted, but it invites the question whether Plaintiffs' other claims — which are, to some extent, intertwined with Counts 2, 5, and 6 — should also be stayed. *See, e.g.*, *Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008) ("[I]f the court concludes that some, but not all, of the claims in [a] case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration." (internal quotation marks omitted)). No later than **February 15, 2019**, each side shall file a letter brief, not to exceed four single-spaced pages, addressing that question and proposing the next steps for this litigation.

The Clerk of Court is directed to terminate Docket Nos. 22, 28, 39, 46, and 48.

SO ORDERED.

Dated: January 31, 2019
New York, New York

_____
JESSE M. FURMAN
United States District Judge